**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **STEPHEN G. & KATHY B. AKERS** | ) | **CASE NO. 12-70999** |
| **SCOTT D. NOELL,** | ) | **CASE NO. 12-70844** |
| | ) | |
| Debtors. | ) | **CHAPTER 13** |

---

### JOINT MEMORANDUM DECISION

The matters before the Court are the Chapter 13 Trustee's objections to confirmation of the Debtors' plans in two unrelated cases, Stephen and Kathy Akers and Scott Noell, which present similar but not identical issues relating to when secured creditors can be compelled to release their liens when they have been paid pursuant to the terms of a confirmed but not yet completed plan.  For the reasons set forth below, the Court will sustain the Trustee's objections.

FINDINGS OF FACT

AKERS CASE

Stephen and Kathy Akers filed a Chapter 13 Plan on May 23, 2012.  Paragraph 11 of that Plan contains the following provision:

> Upon payment of the secured claim of Freedom First Credit Union, as provided in paragraph 3, the creditor shall immediately mark the title to the vehicle securing the claim as "no lien" or "lien released", and shall immediately cause the title, so marked, to be delivered to the Debtor.

> Upon payment of the secured claim of Stellar One Bank, as provided in paragraph 3, the creditor shall immediately mark the judgment lien of record in the Montgomery County Circuit Court as paid in full, satisfied, and released.

Freedom First Credit's debt is secured by a 2005 Honda Pilot and Stellar One Bank's judgment lien is against the Debtors' real property.  The Plan proposes to pay Freedom First Credit $7,972[1] with 6% interest.  Freedom First Credit filed a proof of claim in the amount of $8,179.43 showing the contract rate of interest as 6.44%.  The Plan also proposes to pay Stellar One Bank $1,391 with 6% interest.  Stellar One has filed three proofs of claim for loans secured by deeds of trust against real property, but to date has not filed a proof of claim for the debt involved with the judgment lien addressed in the Plan.  The Debtors listed that debt on Schedule D as $1,391.  On July 5, 2012, the Trustee filed an objection to confirmation on the basis that the Plan fails to provide for the retention of a lien by an allowed secured claim holder in violation of 11 U.S.C. § 1325(a)(5)(B)(i).  Confirmation of the Plan and the Trustee's objection to confirmation were heard on October 22, 2012.

NOELL CASE

Scott Noell filed an amended Chapter 13 Plan on September 4, 2012.  Paragraph 11 of the Plan sets forth the following:

> Upon payment of the secured claim of Roanoke Postal Employee FCU, as provided in paragraph 3, the creditor shall immediately mark the title to the vehicle securing the claim as 'no lien' or 'lien released', and shall immediately cause the title, so marked, to be delivered to the Debtor.

Roanoke Postal Employee Federal Credit Union's loans are secured by a 2006 Dodge Durango.  The Plan proposes to pay the Credit Union $6,141.43 with 6.25% interest.  The Credit Union has filed two proofs of claim.  One proof of claim (claim # 3) is for a credit card account debt in the

---

[1] Debtors' counsel clarified for the Court that the Debtors intend to pay the claim as filed and the amount listed in the Plan was an estimate as to what was owed.

2

amount of $2,272.70 with 9.79% interest which is cross-collateralized by the 2006 Dodge

Durango.  The interest is cross-collateralized due to a loan agreement signed with the Credit

Union when the Debtor purchased the Durango.  The applicable language reads "(2) that the

Property is also security for any other loans, including but not limited to, any credit card loan

that you have with the credit union now or in the future."  The second proof of claim (claim # 4)

is for a separate debt in the amount of $3,868.73 bearing interest at 6.25% per annum for which

the Credit Union has a security interest in the Durango.  The creditor attached to the second

proof of claim a reaffirmation agreement entered into in a previous bankruptcy case in the then

amount of $14,225.59 with 6.25% interest.  The total of both proofs of claim is $6,141.43.  Mr.

Noell is ineligible to receive a discharge in his present Chapter 13 case due to receiving a

discharge in a prior Chapter 7 case in 2009.  The Trustee's objection, filed June 12, 2012, was

continued in order to be heard with confirmation of the amended Plan.  The Trustee objected on

the same basis as the Akers case, failure to provide for lien retention in violation of §

1325(a)(5)(B)(i).  The amended Plan and the Trustee's objection in this case were also heard on

October 22, 2012.


PROCEDURAL HISTORY

On October 22, 2012, the Court heard oral arguments from the Trustee and Mr.

Hart, counsel for the Debtors in both cases.  After hearing the parties' arguments made at the

hearing, the Court took both cases under advisement and requested that the parties submit the

authority they relied on within seven days, which they did.  Thereafter, the Court requested

written clarification of Debtors' counsel's "hanging paragraph" argument, which he promptly

3

provided and to which the Trustee equally promptly replied.  Accordingly, these matters are ready for decision.

CONTENTIONS OF THE PARTIES

At the hearing, the Trustee argued that confirmation should be denied because both plans provide for a cramdown of secured debts without adequate notice to the creditors. Section 1325(a)(5)(B)(i)(I) allows a creditor to retain its lien until the creditor receives payment of the contractual obligation under nonbankruptcy law or the Debtor receives a discharge, whichever first occurs.  In the Akers case, the Debtors will be entitled to a discharge upon completion of all payments due under the Plan, but its provisions for payment of the secured debts are at variance with how satisfaction of those debts would occur under nonbankruptcy law. Therefore, the Plan requirement that the creditor release its lien once payment has occurred pursuant to the provisions of the Plan is inappropriate.  In the Noell case, the Debtor is not entitled to a discharge and likewise in this case the plan proposes that the debt be satisfied upon terms at odds with those provided in the contract.  The Trustee stated that he did not believe that these provisions requiring release of the creditors' liens are permissible.  However, if the Court determines otherwise, he requested guidance on what type of notice is necessary in order to ensure the creditors' acceptance of this type of treatment.

Counsel for the Debtors then contended that because the creditors will be paid their petition-date claims in full, the total amounts owing on the filing date upon the obligations as determined under nonbankruptcy law will be paid in full, albeit not necessarily with post-petition interest at the rates provided in the applicable contracts.  Instead, the obligations will be

4

paid, he contended, with interest at a rate determined in conformity with the Supreme Court's

decision in the *Till* case.[2]  He argued that we must look to the text of the statute to determine

whether the phrase "determined under nonbankruptcy law" modifies the word "debt" or instead

the word "payment."  The general rule of interpretation is that a phrase modifies the noun

immediately preceding it, which in this instance would be "debt" not "payment."  Therefore, as

long as the underlying debt, as determined under nonbankruptcy law, is paid in full, the interest

rate, payment, and term length can be altered without affecting the satisfaction of the debt.

Counsel argued further that if a debtor were required to fulfill every obligation of the underlying

contract, there would be no possible basis for a creditor to assert that its lien should be retained

until satisfaction of all plan obligations.  He then asked, how could a lien be reinstated if the case

were dismissed or converted if all of the contractual obligations had been fulfilled?  This

interpretation, he asserted, would make § 1325(a)(5)(B)(i)(I)(aa) unintelligible.  Reading the

Bankruptcy Code in this way, he argued, deprives Debtors of the benefit provided under *Till* to

modify contractual interest rates.  Counsel asserts that the interest rate in both cases was

determined in accord with the holding in *Till*.  He also made the point that the secured creditors

actually affected by the Plan provisions challenged by the Trustee have not objected to them.

The Debtors have also offered an argument concerning a comparison of the

language of § 1325(a)(5) with the language contained in a new paragraph added to § 1325(a) in

the 2005 legislation effecting major changes in the Bankruptcy Code.  The Bankruptcy Abuse

---

[2]*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

Prevention and Consumer Protection Act ("BAPCPA") added an unnumbered "hanging paragraph" at the end of § 1325(a).[3]  Counsel stated that his interpretation is perfectly consistent with the addition of the so-called "hanging paragraph."  A loan obligation subject to the "hanging paragraph" in a Chapter 13 plan must be treated as fully secured.  If the "hanging paragraph" does not apply though, the debt can be "crammed down" to the value of the collateral, if that is lower than the balance owing on the debt.  Counsel for the Debtors argues that "[s]ection 1325(a)(5)(B)(i)(I) and the hanging paragraph . . . should be read as compl[e]mentary" in that both "were added in the same amendment, . . . modify the same sub-section", and "address and clarify the rights of secured creditors in Chapter 13."  He then elaborates on this theme as follows:  "If, under the hanging paragraph, the claim cannot be modified . . . then, under 1325(a)(5)(B)(i)(I)(aa), the debtor can obtain release of the lien prior to completion of plan payments, so long as the requirements of the hanging paragraph are met."  However, "if the hanging paragraph does <u>not</u> prevent bifurcation . . . the partially secured creditor is given the additional protection under 1325(a)(5)(B)(i)(I)(bb), of retaining its lien . . . until the debtor's discharge."  Counsel for the Debtors goes on to argue, "[c]learly, the protection [afforded] '910' secured claims under the hanging paragraph extends only to the claim amount.

---

[3]  The wording of the "hanging paragraph" is as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

Other contractual terms, such as interest, term, and instalment amount, can be freely modified.  If

the two provisions are complementary, then the plan can provide for release of lien prior to

discharge under 1325(a)(5)(B)(i)(I), upon completion of payments to the '910' claim under the

plan, without regard to contractual provisions other than the claim amount."

   To this line of argument the Trustee replies that the "plain reading of the statutory

definitions" in conjunction with § 1325(a)(5)(b) and the "hanging paragraph" "make it clear that,

absent the creditor's consent, payment of the claim in any fashion other than the creditor's

contract rights prevent release of the lien prior to discharge."  § 101(12) defines "debt" as

"liability on a claim," while §101(5) defines "claim" as a "right to payment . . . ."  "Thus, a lien

cannot be released until the holder of a claim receives payment as determined under non-

bankruptcy law."  The Trustee argues further that a creditor's rights under nonbankruptcy law

include the right to payment at the contract rate of interest and not a rate of interest determined

under the Bankruptcy Code.


## CONCLUSIONS OF LAW

   This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C.

§§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on

July 24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western

District of Virginia.  "Core" proceedings in bankruptcy as provided for in 28 U.S.C. § 157(b)(2)

expressly include "confirmation of plans" and therefore the determination of objections raised to

confirmation.  § 157(b)(2)(L).

The questions before the Court relate to the application of the Supreme Court's decision in *Till* to the language of § 1325(a)(5) as amended by BAPCPA.  Accordingly, a review of both that decision and the pertinent language of the statute is appropriate.

The Supreme Court in *Till* addressed the issue of what interest rate should apply to installment payments made under a Chapter 13 plan.  The creditor in the case argued that the contract interest rate should apply, while the debtor proposed paying a lower rate determined by the prime interest rate plus a percentage associated with the risk of default.  In a decision that had no majority opinion, the Court determined that the prime rate plus risk approach employed by the debtor met the statutory requirements of the Bankruptcy Code.  This approach puts the bankruptcy courts in the position of deciding how much of a risk premium is appropriate and places the burden on creditors to show that a proposed rate is too low.  Justice Thomas, who provided the vote necessary to constitute a majority for the Court's ruling, in a separate opinion opined that no risk premium was required.  He concluded that the debtor need only provide interest sufficient to make the present value of the stream of payments to be made under the plan equal to the amount of the underlying claim.

BAPCPA undertook to make many changes to existing bankruptcy law, including specifically the issue of when a secured creditor could be compelled to release its lien against loan collateral the value of which had been paid under the terms of a confirmed Chapter 13 plan prior to the bankruptcy debtor's completion of all payment obligations under the plan.  The language of §1325(a)(5) prior to BAPCPA provided as follows:

> (a) Except as provided in subsection (b), the court shall confirm a
>     plan if–
>     (5) with respect to each allowed secured claim provided for
>     by the plan–

8

> (A) the holder of such claim has accepted the plan;
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
> (C) the debtor surrenders the property securing such claim to such holder[.]

The amended language pertinent to the issues presented here is as follows:

> (a) Except as provided in subsection (b), the court shall confirm a plan if–
>> (5) with respect to each allowed secured claim provided for by the plan–
>>> (A) the holder of such claim has accepted the plan;
>>> (B)(i) the plan provides that–
>>>> (I) the holder of such claim retain the lien securing such claim until the earlier of–
>>>>> (aa) the payment of the underlying debt determined under nonbankruptcy law; or
>>>>> (bb) discharge under section 1328; and
>>>> (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law[.]
>
>> [Subsections (B)(ii), (B)(iii), and (C) of the current version of § 1325(a)(5) have been omitted as not pertinent.]

9

EFFECT OF SECURED PARTY'S FAILURE TO OBJECT

A number of bankruptcy court decisions have held that a secured party's failure to object to its treatment under the provisions of a properly noticed plan amounts to its acceptance of that treatment pursuant to § 1325(a)(5)(A).[4] On the other hand, a significant minority of other decisions, including several within the United States Fourth Circuit, have held to the contrary. In 2010 Judge Mitchell (now retired) of the Bankruptcy Court for the Eastern District of Virginia explicitly rejected the argument that a mortgagee had "accepted" its treatment under a proposed Chapter 13 plan by not objecting to it, stating, "Although BAC did not file an objection to confirmation of the plan, this does not mean that it consents to a treatment otherwise at odds with the Bankruptcy Code." *In re Russell*, 458 B.R. 731, 739-40 (Bankr. E.D. Va. 2010). The following year Judge Aron of the Middle District of North Carolina Bankruptcy Court similarly held that the failure of a creditor to object to a plan did not amount to acceptance. *In re Martin*, 444 B.R. 538, 547 (Bankr. M.D.N.C. 2011). In *Martin* the debtor put a clause in the plan reading, "Failure to file a timely objection to this plan shall constitute acceptance of this plan by Colonial, pursuant to §1325(a)(5)(A)." The plan provided for a reduced principal amount, reduction of interest below the *Till* rate, and re-amortizing of any existing arrearage over the life of the new modified loan. The court held that § 1325(a)(1) vests bankruptcy courts with the responsibility of ensuring that all confirmed plans adhere to the requirements of the Bankruptcy

---

[4] *See In re Jones*, 530 F.3d 1284, 1291 (10th Cir. 2008); *In re Andrews*, 49 F.3d 1404, 1409 (9th Cir. 1995); *In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989); *In re Flynn*, 402 B.R. 437, 445 (B.A.P. 1st Cir. 2009); *In re Schultz*, 363 B.R. 902 (Bankr. E.D. Wis. 2007); *In re Harrison*, 394 B.R. 879 (Bankr. N.D. Ill. 2008). *See also* 8 *Collier on Bankruptcy* ¶ 1325.06[2], at p. 1325-30 and -31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012); Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, *4th Edition*, § 220.1, at ¶ 10, Sec. Rev. June 11, 2004, www.Ch13online.com.

Code and thus denied confirmation.  Judge Duncan of the Bankruptcy Court for the District of

South Carolina cited and followed both Judge Mitchell's decision in *Russell* and Judge Aron's

holding in *Martin*, as well as the Supreme Court's decision in the case of *United Student Aid*

*Funds, Inc. v. Espinosa*, __ U.S. ___, 130 S.Ct. 1367, 1381 (2010), in his opinion in the case of

*In re Madera*, 445 B.R. 509, 513-14 (Bankr. D.S.C. 2011).  That decision expressly stated,

"However, section 1325 requires that the plan comply with all the provisions of chapter 13 and

any applicable provisions of title 11, even in the absence of objections.  Therefore, even if no

creditor objects to confirmation of the proposed plan, it must still meet the requirements of

section 1325(a)."[5]  *Id.* at 514.

This Court finds more persuasive the latter line of authority to the effect that

§ 1325(a)(5)(A) contemplates an express rather than an implied acceptance of a plan's treatment

by the impaired creditor.  For one thing, such an interpretation is more consistent with the usual

understanding of a very similar provision in Chapter 11 of the Bankruptcy Code, namely, 11

U.S.C. § 1129(a)(8)(A) ("such class [of claims or interests] has accepted the plan").[6]  Second, the

District Court and this Court have previously recognized that the bankruptcy court has an

independent duty not to confirm plans which violate applicable sections of the Code even when

---

[5]*See also In re Woolsey*, 438 B.R. 432, 436 n.4 (Bankr. D. Utah 2010) (by implication in a case where the Chapter 13 Trustee had filed an objection but the creditor apparently had not) ("Debtors could also comply with § 1325(a)(5) if CitiBank were to accept the plan under § 1325(a)(5)(A)– which it has not – ").

[6]"That is, each impaired class must have affirmatively accepted the plan."  7 *Collier on Bankruptcy* ¶ 1129.02[8], at p. 1129-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).  *See also In re Pecht*, 53 B.R. 768, 771 (Bankr. E.D. Va. 1985).

11

no objection has been filed by a party in interest to the offending plan provision.    In the joint

decision, *In re Harris and Jarrell*, this Court set out:

> Under the provisions of the Bankruptcy Code, this Court is required
> to confirm a Chapter 13 plan if it complies with the requirements of
> 11 U.S.C. § 1325. This Court also believes, however, that it has an
> independent duty not to confirm plans which it believes to be
> contrary to the pertinent provisions of the Bankruptcy Code
> irrespective of whether a creditor or other party in interest objects to
> confirmation. *See United States v. Easley,* 216 B.R. 543, 544 n.1
> (W.D. Va. 1997).

*In re Harris and Jarrell,* Case Nos. 06-70538 and 06-71129, slip op. at 4-5 (Bankr. W.D. Va.

Jan. 12, 2007)*.*  Much more importantly, however, the Supreme Court ruled to the same effect

when stating:

> § 1325(a) instructs a bankruptcy court to confirm a plan only if the
> court finds, *inter alia*, that the plan complies with the 'applicable
> provisions' of the Code . . . .  Thus, contrary to the Court of Appeals'
> assertion, the Code makes plain that bankruptcy courts have the
> authority – indeed, the obligation – to direct a debtor to conform his
> plan to the requirements of §§ 1328(a)(2) and 523(a)(8).

*Espinosa,* 130 S.Ct. at 1381.  Lastly, all of the cases to the contrary noted in footnote # 4 above

were decided prior to the Supreme Court's *Espinosa* decision in 2010.

The Court doubts that Congress intended to provide an incentive to bankruptcy

debtors to insert otherwise impermissible plan provisions for the treatment of secured claims in

their Chapter 13 plans on the chance that the affected creditors would not go to the trouble of

retaining counsel to object to confirmation of the plans containing such provisions and that

thereby such debtors would gain the benefit of treatment which would not be allowed upon an

objection being filed.  For these reasons the Court will reject the Debtors' suggestion that the

failure of the secured creditors in these cases to object to the plan provisions requiring that they

12

release their liens on the Debtors' property prior to successful completion of the plans should be

treated as an acceptance of such provisions and thereby deprive the Trustee of any standing to

make an objection.


### WHEN DOES "PAYMENT OF THE UNDERLYING DEBT DETERMINED UNDER NONBANKRUPTCY LAW" OCCUR?

Both of these cases involve the payment of the petition-date balances of the

amounts due to the creditors under the applicable contract or judgment provision.  That is to say

that neither involves payment of some lesser "crammed down" value of the property upon which

the liens are affixed.  The seemingly simple question is whether the payment of these balances

with interest determined in accord with the provisions of the *Till* decision, rather than at the rates

which the lien creditors would be entitled to insist upon outside of bankruptcy, is adequate to

constitute satisfaction of the underlying "debt determined under nonbankruptcy law"?  If so,

there is nothing improper about the plan provisions requiring the creditors to release their liens

when that satisfaction has occurred.  If not, such plan provisions are inconsistent with the Code.

Debtors' counsel has submitted four decisions, all out of Illinois, as the authority

he relies on for his argument.  Each will be discussed in turn.  *In re Williams*, 367 B.R. 625

(Bankr. N.D. Ill. 2007), was the first case decided.  In it, the debtor proposed to pay a secured

creditor the claim as filed with an interest rate determined under *Till*.  The debtor was ineligible

to receive a discharge and the secured creditor objected to plan confirmation.  The court agreed

that *Till* applied to §1325(a)(5)(B)(ii), but stated that when Congress enacted BAPCPA it

established a "new and different requirement."  *Id.* at 628.  According to the court, debtors now

must also provide for lien retention until one of the requirements of this section has been met.

13

Because the debtor was ineligible to receive a discharge the debtor must pay "the underlying debt determined by nonbankruptcy law." The court held that if the debtor was not in bankruptcy, the debt would have to be paid in full at the contract rate of interest in order to have the lien released. Therefore, the debtor must pay the debt in full at the contract rate of interest in order to have the lien released pursuant to §1325(a)(5)(B)(i)(I)(aa).

The second decision is *In re Hopkins*, 371 B.R. 324 (Bankr. N.D. Ill. 2007). Like *Williams,* the debtor was ineligible to receive a discharge and the secured creditor objected to plan confirmation. The court held that the *Williams* decision was incorrect and that a debtor could modify contractual terms such as timing of payments and interest rate. The court read §1325(a)(5)(B)(i)(I)(aa) together with the Chapter 13 debtor's ability to modify secured claims, other than one secured solely by the debtor's principal residence, pursuant to §1322(b)(2). The court then parsed the precise statutory language of the phrase "payment of the underlying debt determined under nonbankruptcy law." It concluded that the modifying clause "determined under nonbankruptcy law" modified the word "debt," as "debt" rather than the word "payment" immediately precedes the critical phrase. Therefore, the debt is what is determined under nonbankruptcy law, which would constitute the claim as of the petition date. As long as that condition is satisfied, the interest rate can be modified and the debtor can still have the lien released. Based on this analysis, the court overruled the creditor's objection and confirmed the plan.

The third decision, *In re Lilly*, 378 B.R. 232 (Bankr. C.D. Ill. 2007), partially agreed with the court in *Hopkins,* in that a debtor can modify a creditor's contract interest rate during the plan. However, *Lilly* diverged from *Hopkins* on the effect the modifications would

14

have for debtors not entitled to discharge after the completion of their plans.  Like the previous

two cases the debtor in *Lilly* was not entitled to a discharge and a secured creditor objected to

confirmation.  The court held that the phrase "debt determined under nonbankruptcy law" was

forward looking.  When a Chapter 13 debtor modifies the interest rate during a plan pursuant to

*Till*, the modification only becomes binding upon the debtor's discharge.  If the debtor is not

eligible for discharge, the modifications made in the plan are no longer binding after the plan has

been completed.  After completion of the plan, the debtor remains liable for the underlying debt

determined under nonbankruptcy law, including interest calculated at the contract rate that

accrued during the plan.  Thus, in order to be entitled to have a lien released under

§1325(a)(5)(B)(i)(I), the debtor must either under subsection (bb) receive a discharge, or if

ineligible, under subsection (aa), pay the entire underlying debt in full at the contract rate of

interest, although the interest rate may be modified during the term of the plan.

   The final case cited by Debtors' counsel is *In re Harrison*, 394 B.R. 879 (Bankr.

N.D. Ill. 2008).  There, the court adopted the reasoning of *Lilly* and found that a debtor ineligible

for discharge can modify the interest rate of a secured claim during the plan, but after completion

of the plan is responsible for the underlying debt, which includes accrued interest at the contract

rate of interest.  This interpretation gives debtors who are ineligible for discharge the benefit of

§1322(b)(2) while in bankruptcy, but then requires that the debtors pay the "underlying debt

determined by nonbankruptcy law" prior to receiving a lien release.

   The Chapter 13 Trustee submitted two cases on which he relies for his arguments.

The first, *In re Boardman*,[7] sustained the creditor's objection to plan confirmation.  The Debtor's

---

[7]  No. 10-12656, 2011 WL 478987 (Bankr. N.D. Cal. Feb. 7, 2011).

plan could not be confirmed because the plan provided for lien release upon payment of
$400,000, the value of the underlying collateral, as opposed to the $629,000 the creditor was
owed.  The court held that, under § 1325(a)(5)(B)(i)(I), the lien must be retained until the debtor
pays the full amount of the debt, $629,000.  This decision concerned the modification of the
underlying debt, not a modification of the interest rate.  *Boardman* is distinguishable from the
present cases based on the fact that the debtor in *Boardman* attempted to pay the value of the
collateral as opposed to the underlying debt.  The Debtors in the present cases propose to pay the
entire debts owed at a modified rate of interest.

　　　The second case cited by the Trustee is *In re Picht*, 428 B.R. 885 (B.A.P. 10th
Cir. 2010).  In *Picht* the debtors proposed to pay the value of the equity in their residence above
the mortgage, $15,000, on the creditor's in rem judgment.  The in rem judgment was in the
amount of $127,000.  The creditor objected to this treatment.  The court held that the plan could
not be confirmed because it only provided for payment of the amount determined under
bankruptcy law.  The court also held that the plan must provide that if the case is dismissed or
converted prior to completion of the plan, the creditor will retain its lien on the collateral until
full payment or extinguishment under nonbankruptcy law.  As in *Boardman* this case concerns
payment of less than the full amount of the debt.  The debtors in *Picht* proposed to pay less than
what was owed on the underlying claim and then required that the lien would be released.  Thus
this decision is also distinguishable from the two cases before this Court as the Debtors' plans
both propose to pay the secured creditors their claims in full, as determined on the date of the
petition.

16

DECISION

The *Hopkins* decision cited by Debtors' counsel does support his contention that the interest rate applicable to the satisfaction of an obligation concerns the "payment" of the debt rather than the "debt" itself.  There are a couple of points about that holding that are worth noting.  First, the principal issue posed in that case by the secured creditor was not the timing of the release of its lien on the motor vehicle.  Rather, it was whether a car, which was subject to the protection of the "hanging paragraph," had to be paid pursuant to the terms of the financing contract or could be paid upon different bankruptcy terms so long as the balance owing as of the filing date was paid in full.  In *Hopkins* Judge Goldgar ruled, in accordance with the great weight of authority, that the "hanging paragraph" only protected the vehicle lenders against payment of a "crammed down" value, not against the application in bankruptcy of an interest rate permissible under *Till*.[8]  That decision authorized a Chapter 13 debtor not eligible to receive a discharge to satisfy a "910" obligation with interest at a rate permissible under *Till* but less than the rate specified in the contract.  Second, while that decision does support the Debtors' arguments in the cases before this Court, it remains a minority of one even among the published decisions by other judges of the same court.  Of course simply the fact that it is in the minority does not mean that it is wrong.  This Court believes that it is mistaken, however, for the following reasons.

1.  Most importantly, as noted by the Trustee, the term "debt" is a defined term in the Bankruptcy Code.  That definition is, "liability on a claim."  11 U.S.C. § 101(12).  That definition utilizes another term, "claim," which is also a defined term in the Code.  That latter

---

[8] *See In re Phillips*, 362 B.R. 284, 306 (Bankr. E.D. Va. 2007).

definition, in relevant part, is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5).  The Court believes it is clear that a creditor possessing a claim for payment of money from a debtor has a "right to payment" of both the principal and the agreed interest upon a debt obligation.  It seems accurate to suggest that, generally speaking, the two most significant terms of an obligation to pay money, from an economic perspective, are the amount of the debt and the interest to be paid for the use of the money.  To be more specific, while it may be accurate to say that A owes B $1,000, it is more completely accurate to say, for example, that A owes an obligation to repay B $1,000 plus interest at some agreed rate over a term of some agreed number of months in monthly payments of the amount necessary to amortize the debt in full over that agreed term.  To change the terms of any debt obligation is in actuality to substitute a new debt obligation for the one originally agreed upon by the parties to that obligation.  Similarly, the agreed term of an obligation may also be a matter of some economic importance to the parties.  In both consumer and commercial financing it is not uncommon for the interest rate agreed to by the parties to have a very definite connection to the agreed term over which the obligation will be paid.  For example, the different rates in the marketplace for fifteen versus thirty year residential mortgage loans is common knowledge.  Similarly, in the field of retail consumer automobile financing, a consumer may be able to obtain 0% financing for some agreed term of repayment or a lower sale price for a cash purchase, but not both as a part of the same transaction, or the consumer might be able to obtain, for example, a promotional 1.9% rate for a 24 month contract, a 2.9% rate for a 36 month contract, or a 3.9% rate for a 48 month contract.  Neither is the right to prepay an obligation at

18

the principal balance owing plus accrued interest to the date of payment a given.  Unless the

obligation contains language to the effect of "right of anticipation reserved" or "right of

prepayment without penalty is reserved," the general rule outside of bankruptcy is that an obligor

does not have the right, without the creditor's consent, to prepay an obligation prior to its

scheduled maturity.[9]  To summarize, the basic point is that a "debt" involves considerably more

than simply the principal balance plus accrued interest owing as of some particular point in time.

2.  BAPCPA's revision of the language of § 1325(a)(5)(B)(i) and addition of the

"hanging paragraph" at the very end of § 1325(a) addressed two different but somewhat related

issues.  Subsection (B)(i) was enacted for the specific purpose of settling when a creditor holding

a secured claim which has been "paid" under the terms of a confirmed Chapter 13 plan prior to

completion of the plan is obliged to consider the debt paid and release its security interest in the

property serving as collateral to assure the full payment of the obligation.[10]  To that end it

provides that the holder of an "allowed secured claim provided for by the plan" shall "retain the

lien securing such claim" until the earlier of "the payment of the underlying debt determined

under nonbankruptcy law" or the awarding of a discharge under § 1328.  11 U.S.C. §

1325(a)(5)(B)(i)(I).  Using both a "belt and suspenders" approach to the issue, it then provides in

the immediately following subsection, (II), that if the case under Chapter 13 "is dismissed or

---

[9] "Indeed, a mortgagor generally has no right to pay off his or her obligation prior to its
stated maturity date in the absence of a prepayment clause in the mortgage or contrary statutory
authority."  55 Am. Jur. 2d *Mortgages* § 306.  *See also* 13A M.J. *Mortgages and Deeds of Trust*
§ 82 (2011).

[10] *See* 8 *Collier on Bankruptcy* ¶ 1325.06[3][a], at p. 1325-33 (Alan N. Resnick & Henry
J. Sommer eds., 16th ed. 2012).

converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law."

Conversely, the "hanging paragraph" was added by BAPCPA to address creditor complaints, particularly with respect to the consumer retail financing of motor vehicles, a major component of the American economy, with respect to bankruptcy debtors purchasing property prior to a bankruptcy filing, sometimes just a few months before filing, at a retail value, but then undertaking to pay for such property on a depreciated value basis which was often significantly less than the unpaid balance owing on the contracts. This could result, and frequently did, in a bankruptcy adjusted contract which was far different than what the respective parties had agreed to at the time the contract was entered into. The language of the "hanging paragraph" was clearly devised to address the issue of collateral valuation and bankruptcy "cramdowns." Equally clearly, Congress, as it easily could have done, did not employ language which would have compelled bankruptcy debtors obligated under car financing contracts to make the stark choice of either (i) surrendering their vehicles to the secured lenders or (ii) assuming the existing contractual obligations in bankruptcy. Whether or not a particular secured obligation is protected under the provisions of the "hanging paragraph" from debt writedown does not alter the effect of § 1325(a)(5)(B)(i) on when the lender must relinquish its security interest in the relevant collateral.

3. The logic of the argument advanced by the Debtors in these cases and accepted by Judge Goldgar in *Hopkins* to the effect that the "debt" determined under nonbankruptcy law for the purpose of applying § 1325(a)(5)(B)(i) is the amount owing on the filing date compels the conclusion, as *Hopkins* expressly held, that even a bankruptcy debtor not eligible for a discharge

20

can fully satisfy a secured debt by paying the interest provided for in a confirmed plan and thereby be relieved of the obligation to pay the greater interest which would be due under the applicable contractual terms outside of bankruptcy.  However one may characterize such a result, it is evident that its practical effect is to discharge a part of his obligation to the creditor[11] with the debtor retaining the full benefit of the bargain with the creditor, namely, the use, enjoyment and ownership of the property securing the obligation, upon favorable terms but with the creditor receiving a discounted benefit on its end of the bargain.  A contention that a debtor can obtain a partial discharge of obligations in bankruptcy when he is directly excluded from obtaining a general discharge appears to have a notably weak foundation.

4.  The Court fails to see how a plan provision which requires a secured creditor, absent its express consent, to release its lien on the title to property serving as the creditor's collateral once that creditor has received all the money it is going to receive under the terms of a confirmed plan, can be reconciled with the language of § 1325(a)(5)(B)(II), which provides that at any point in the case if it "is dismissed or converted without completion of the plan," the creditor's lien "shall also be retained . . . to the extent recognized by applicable nonbankruptcy law."  This Court agrees with Judge Thurman in *Woolsey* that the relief available to Chapter 13 debtors "at the completion of the plan provides an incentive for debtors to fulfill their plans."  438 B.R. at 438.  That clearly was a reasonable legislative judgment for Congress to make.

---

[11] *See Lindskog v. M & I Bank (In re Lindskog),* 480 B.R. 916, 919 (E.D.Wis. 2012) (Chapter 13 debtor ineligible for a Chapter 13 discharge not permitted to "strip off" a wholly unsecured subordinate lien; "Stripping off the wholly unsecured lien on Lindskog's Wisconsin residence amounts to a de facto discharge and undermines Congress's desire to prevent debtors from exploiting loopholes in the bankruptcy system as the expense of other entities.").  This decision cites cases on both sides of this issue and rejects the contrary holding from another judge of the same court in the case of *In re Fair*, 450 B.R. 853, 857 (E.D.Wis. 2011).

5.  For the reasons previously set forth in this decision, the Court concludes that the failure of the creditors affected by the provisions challenged by the Trustee to object to them does not mean that the creditors have "accepted" such treatment within the meaning of § 1325(a)(5)(A).

6.  Although perhaps not properly included as one of the reasons for the ruling explained in this opinion, the Court's confidence in the correctness of such ruling is buttressed by the fact that it is in accord with the analysis contained in the highly regarded treatise, *Chapter 13 Bankruptcy, 4th Edition*, authored by Bankruptcy Judge Keith M. Lundin and Retired Bankruptcy Judge William H. Brown, at ¶ [5], ¶ [7] and ¶ [8] of § 447.1, as follows:

> ¶ [5] What this means for the mathematics of lien retention is that the liens of allowed secured claim holders must be retained by the plan until discharge except in the unusual case in which the confirmed plan pays all of the secured claim holder's contract entitlements at some earlier time. For example, if the plan treats a lienholder as fully secured, to be paid in full in 36 monthly installments with 8 percent interest, completion of the 36 monthly payments will not entitle the debtor to release of the lien unless the 36 monthly installments plus 8 percent interest equal (or exceed) the contractual, nonbankruptcy entitlements of the lienholder. If the contractual interest rate was 16 percent, release of the lien on these facts must wait until discharge—which may or may not coincide with the completion of 36 monthly payments to the lienholder under the confirmed plan.

> ¶ [7] Notice that even a 100 percent plan that pays the secured portion of an undersecured debt in full with interest and pays all allowed unsecured claims in full would not support lien release before discharge unless by happenstance payments on the secured and unsecured portions satisfy the nonbankruptcy entitlements of the lienholder at some earlier time. This is most unlikely because very few Chapter 13 plans pay postpetition interest to unsecured claim holders and the "present value" interest paid to secured claim holders at confirmation is almost always different than the contract interest rates in the underlying debt instrument.

¶ [8] Perhaps the only lining in this cloud is that discharge under §
1328 will be based on the completion of payments under the
confirmed plan without regard to whether the underlying debt of an
allowed secured claim holder has been paid in full under
nonbankruptcy law. In other words, at discharge, liens can be
released even if the entire contract rights of an allowed secured claim
holder have not been paid through the confirmed plan. Lienholders
have argued with no success that BAPCPA allows liens to survive
discharge to secure the payment of underlying debt determined under
nonbankruptcy law notwithstanding the completion of payments
under the plan.  Chapter 13 debtors do not have to pay full contract
interest rates and all other contract charges in order to accomplish the
release of liens through a confirmed plan, but lien release must await
discharge after the BAPCPA amendments to § 1325(a)(5)(B)(i)(I).

Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy, 4th Edition* § 447.1, at ¶5, 7, 8,

Sec. Rev. July 12, 2007, www.Ch13online.com.

For these reasons the Court will sustain the Trustee's objections to confirmation

of the plans in these two cases and will confirm such plans only if the provisions challenged by

the Trustee are removed or appropriately revised.  An order to such effect will be entered

contemporaneously herewith.

This 10th day of December, 2012.

William F. Stone, Jr.

_____
UNITED STATES BANKRUPTCY JUDGE